**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE**

| | | |
|---|---|---|
| NICHOLAS ENNIS, FIREARMS POLICY | ) | |
| COALITION, INC., and FIREARMS POLICY | ) | |
| FOUNDATION, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:20-cv-805 |
| | ) | |
| COUNTY OF SUMNER, TENNESSEE; | ) | Chief Judge Waverly D. Crenshaw |
| CHRIS SANFORD, KYLE MAHANEY, | ) | Mag. Judge Barbara D. Holmes |
| JUSTIN DOWNS, and CARL EDISON in | ) | |
| their individual capacities, | ) | JURY DEMAND |
| | ) | |
| Defendants. | ) | |

<u>**Point and Authorities in Support of Plaintiffs' Motion for Summary Judgment**</u>

**Introduction**[1]

This case is simply *Cohen v. California*, 403 U.S. 15 (1971), but with a sticker instead of

a jacket. Just as the Supreme Court held that the First Amendment protects wearing a jacket saying

"Fuck the Draft"—because such a message does not fall within any First Amendment exception,

such as for obscenity or fighting words—so the First Amendment protects displaying a car sticker

saying "Fuck Gun Control."

"Speech by citizens on matters of public concern lies at the heart of the First Amendment."

*Lane v. Franks*, 573 U.S. 228, 235 (2014). Indeed, "advocacy of a politically controversial

---

[1]     Plaintiffs' suit initially named as Defendants: Sumner County, Tennessee; Sumner County
Sheriff Sonny Weatherford and Sumner County Chief Executive Anthony Holt, in their official
capacities; and Deputy Sheriff Chris Sanford, Deputy Sheriff Kyle Mahaney, Officer Justin
Downs, and Officer Carl Edison in both their official and individual capacities. Dkt. No. 1. This
Court later dismissed the official-capacity claims, finding them redundant of Plaintiffs' claim
against Sumner County itself, and the court ordered the case to proceed against the County and
Defendants Sanford, Mahaney, Downs, and Edison in their individual capacities. Dkt. No. 32.

1

viewpoint ... is the essence of First Amendment expression," *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995), and is thus "entitled to *special* protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983) (italics added). Here, there can be no genuine dispute that the Defendants in this case are directly targeting such speech through unconstitutional law enforcement policies, practices, and customs that seek to suppress classically protected political speech on the public roads. Plaintiffs are therefore entitled to summary judgment, which they now seek from this Court.

**Statement of Facts**

On the afternoon of September 25, 2019, Ennis stopped at a gas station in Sumner County, Tennessee to refuel his truck. SOMF ¶ 1. Displayed on a side window of Ennis's truck was a sticker with an image of two firearms flanking the letters "U" and "C," above the words "gun control" which, viewed collectively, conveyed the message "Fuck Gun Control." SOMF ¶ 2.

While Ennis was refueling his truck, Deputies Chris Sanford and Kyle Mahaney of the Sumner County Sheriff's Office ("SCSO") surveilled him from inside their patrol car parked nearby.[2] SOMF ¶ 3. After Ennis was done refueling, he started to drive away, but Sanford immediately got behind him in the SCSO patrol car and activated the car's lights, causing him to stop before exiting the station. SOMF ¶ 4. The truck had no visible signs of safety issues, damage, or registration violations, and Ennis had not committed any moving violations warranting a traffic stop; instead, the window sticker was the sole reason for the stop. SOMF ¶ 5.

Sanford approached Ennis's driver-side window and said Ennis was stopped because the message on the window sticker violated a state law regulating "obscene and offensive" speech. SOMF ¶ 6. Ennis objected that the message was constitutionally protected free speech under the

---

[2]     According to a recent filing by defense counsel (Dkt. No. 34), Sanford has since resigned.

First Amendment. SOMF ¶ 7. When Sanford nevertheless continued to assert that the content of the message violated state law, Ennis asked to speak to Sanford's supervisor. SOMF ¶ 8.

Mahaney, who was Sanford's supervisor at the time, then joined Sanford at the driver's side window, but they continued to assert that the message was unlawful despite Ennis's continued objections that it was protected free speech under the First Amendment. SOMF ¶ 9. Sanford indeed issued Ennis a formal citation for purportedly violating T.C.A. § 55-8-187, which prohibits "the display of obscene and patently offensive . . . bumper stickers, window signs or other markings on or in a motor vehicle that are visible to other drivers," with the written basis of the citation being that Sanford "did observe said vehicle with window sticker depicting 'FUCK Gun Control'" which Sanford described as an "Obscene Sticker." SOMF ¶ 10.

The scene is depicted below:



Compl., Exhibit A.

Mahaney remained present and actively involved on the scene as Sanford prepared and issued the citation for the alleged violation of T.C.A. § 55-8-187 based on this speech about gun control, indicating he supported the action. SOMF ¶ 11. Mahaney has since expressly stated that he agreed with Sanford's decision to initiate the stop and issue the citation. SOMF ¶ 12. And both he and Sanford now say their "actions upheld the Constitution of the United States." SOMF ¶ 13.

When Ennis continued to contest the legality of the enforcement actions taken against him for the display of the gun control message during the traffic stop, Mahaney referred him to Lieutenant Justin Downs and another senior SCSO officer, indicating that Ennis must contact them with any further complaint. SOMF ¶ 14. The actions of Sanford and Mahaney were consistent with training, instruction, and guidance they had received from the SCSO under Sheriff Weatherford regarding the SCSO's law enforcement policies, practices, and customs. SOMF ¶ 15.

Later the same day, Ennis telephoned the SCSO, requesting to speak to Sanford's supervisor about challenging the citation, and he was referred to Downs, who had seniority over both Sanford and Mahaney. SOMF ¶ 16. In discussing the illustration of the word "Fuck" through the graphics of the AR-15 and AK-47 firearms on the sticker, Downs told Ennis, "some may find that offensive, which would fall under the statute" Ennis was cited for violating, and he (Downs) "wouldn't want [his] 10 and 12 [year-old children] to see something like that." SOMF ¶ 17.

Downs has since stated that he "agree[s] the deputies had probable cause to issue the citation," and that "fuck" is a "curse" word that "can be offensive." SOMF ¶ 18. He has also since stated that his "actions upheld the Constitution of the United States." SOMF ¶ 19.

When Ennis continued to contest the enforcement actions as in violation of his First Amendment rights during his phone call with Downs, Downs referred him to Major Carl Edison,

Downs's supervisor, for purposes of moving the complaint up through the chain of command, and he sent an email to Edison explaining how he had responded to Ennis's objections. SOMF ¶ 20.

Edison spoke with Ennis by phone the following day, in a recorded conversation, during which he said he would not question the validity of these enforcement actions because he was not present at the scene. SOMF ¶ 21. Rather, as Defendants themselves have characterized it, "Defendant Edison noted Plaintiff's complaint but allowed the citation to stand." SOMF ¶ 22.

Like the others involved, in response to this lawsuit, Edison has stated that he personally believes these law enforcement actions were "valid and legal." SOMF ¶ 23. And, he has further claimed that his "actions upheld the Constitution of the United States." SOMF ¶ 24. During his phone call with Ennis, Edison indicated that there was nothing he could or would do about it, that the process would just have to play out in court, and he said he thought it would "be interesting" to see "what transpired" in court with the citation. SOMF ¶ 25. The actions of Downs and Edison were also consistent with training, instruction, and guidance they had received from the SCSO under Sheriff Weatherford regarding its policies, practices, and customs in the interpretation and enforcement of the law. SOMF ¶ 26.

Within the last six years, at least two other people in Sumner County have been cited by Sumner County Sheriff deputies for displaying stickers with messages containing the word "fuck" and, upon information and belief and in light of the practices, policies, and customs at issue that, by Defendants' own admission, target political speech containing "curse" words that "can be offensive," in neither of these instances did the use of the word "fuck" appeal to any prurient sexual interests or otherwise relate to any sexual conduct. SOMF ¶ 27.

Indeed, all Defendants, as well as County Sheriff Weatherford and County Chief Executive Anthony Holt, continue to stand in solidarity in supporting these law enforcement actions against

5

Ennis as being entirely lawful. SOMF ¶ 28. Their theory is that Ennis's display of the window sticker containing the word "Fuck" is subject to lawful suppression under of T.C.A. § 55-8-187 because, even though the word has both sexual and non-sexual meanings, it is a "curse word" that "can be offensive." *Id.* For this reason, they all deny any violation of any constitutional rights and insist that they lawfully can and will continue to take similar enforcement actions against such "patently offensive" speech under the auspices of T.C.A. § 55-8-187. SOMF ¶ 29.

Ennis was prosecuted for more than three months in the General Sessions Court of Sumner County, where he mounted a strenuous constitutional defense through legal counsel paid by Plaintiffs FPC and FPF, until the County prosecutor finally abandoned the matter *nolle prosequi* on January 3, 2020. SOMF ¶ 30. No one within the SCSO ever received any complaints from the public about Ennis's sticker, either before or after he was issued the citation at issue. SOMF ¶ 31.

Defendant County of Sumner, Tennessee is the corporate governmental entity established under the laws of the State of Tennessee, *see* T.C.A. §§ 5-1-101 & 5-1-103, ultimately responsible for managing all business of the County, which includes the policies, customs, and practices at issue in this case, through its elected county officials, *see* T.C.A. §§ 5-1-104(a) & 6-2-1-201(28)(A), who include Sheriff Weatherford as well as County Executive Holt. SOMF ¶ 32. The County government includes the SCSO maintained by Sheriff Weatherford. SOMF ¶ 33.

The County is thus responsible for the oversight and management of the affairs conducted by the Sheriff and the SCSO he maintains, including (1) establishing and implementing the policies, customs, and practices concerning appointment, training, supervision, discipline, and retention of the SCSO personnel, and (2) the law enforcement activities of the SCSO peace officers, including Defendants Sanford, Mahaney, Downs, and Edison, who act under a delegation of authority from the Sheriff to carry out of the policies, customs, and practices of the SCSO.

6

SOMF ¶ 34. The County is thus aware or reasonably presumed to be aware of and have control over all such law enforcement activities, policies, customs, and practices of the Sheriff and the SCSO. SOMF ¶ 35. This includes the enforcement actions, policies, practices, and customs of the Sheriff, the SCSO, and Defendants Sanford, Mahaney, Downs, and Edison giving rise to Plaintiffs' claims, which the County has expressly or tacitly ratified, approved, and supported. SOMF ¶ 36.

## Legal Standards on Motions for Summary Judgment

"[S]ummary judgment on all or part of [a] claim" is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(2). A "genuine" issue of material fact exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Thus, the nonmoving party must set forth "specific facts showing there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 247-48 (emphasis removed).

The movant's burden is not "to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "Instead, . . . the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* So, to survive such a motion, "the nonmoving party must adduce concrete evidence on which a reasonable juror could return a verdict in her favor." *Fenney v. Wal-Mart Stores East, LP*, 441 F.Supp.3d 635, 638 (W.D. Tenn. 2020).

Summary judgment must be granted unless "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative," no "genuine" trial issue exists, and "summary judgment may be granted." *Id.* at 249-50 (citations omitted). Indeed, "[t]he court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (italics added).

## Argument

Here, the undisputed and indisputable facts show that Plaintiffs should be granted summary judgment. The sole argument Defendants advance in claiming that their actions were "valid and legal" and "upheld the Constitution" rests on an objectively unreasonable and untenable interpretation of the Tennessee statutory scheme they have employed to suppress protected political speech in direct violation of clearly established free speech law.

**A.      Ennis's Speech Was Protected Under *Cohen v. California***

In *Cohen v. California*, 403 U.S. 15 (1971), Cohen strode through a courthouse in 1968 wearing a jacket bearing the slogan "Fuck the Draft"—at a time when the draft was at least as controversial as gun control laws are now. The Court ruled he was fully within his First Amendment rights to do so:

1.  The Court held that the word "fuck" is constitutionally protected. "[W]hile the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric." 403 U.S. at 25. "[W]e cannot indulge the facile assumption that one can forbid particular words without also running a substantial risk of suppressing ideas in the process." *Id.* at 26.

2. The Court held that the word used as a political pejorative does not fit within the category of "obscenity." "Whatever else may be necessary to give rise to the States' broader power to prohibit obscene expression, such expression must be, in some significant way, erotic." *Id.* at 20. And "[i]t cannot plausibly be maintained that this vulgar allusion to the Selective Service System would conjure up such psychic stimulation in anyone likely to be confronted" with Cohen's "Fuck the Draft" jacket.

3. The Court held that the word written on the jacket also does not fit within the category of "fighting words." "[W]hile potentially offensive to some, no one else present could reasonably have regarded the words on appellant's jacket as a direct personal insult." *Id.* at 20. Because the message was not the sort of individually targeted insult designed to or likely to start a fight, the Court held that Cohen "could not, consistently with the First and Fourteenth Amendments, be punished for asserting the evident position on the inutility or immorality of the draft his jacket reflected." *Id.* at 18.

Precisely the same reasoning applies to Ennis's "Fuck Gun Control" sticker.

The Supreme Court has recognized that such words are protected even when said online by a public high school student, in a social media rant about cheerleading ("Fuck school fuck softball fuck cheer fuck everything"). *Mahanoy Area School District v. B. L. by and through Levy*, __ U.S. __, 141 S.Ct. 2039, 2043 (2021). The speech, "while crude, did not amount to fighting words," and while "vulgar[]," "was not obscene." *Id.* at 2046.

Here, the government's action was even more clearly unconstitutional: It targeted the speech of an adult, it threatened criminal punishment and involved a coercive seizure rather than just administrative disciplinary measures, and it focused on overtly political speech. "Our representative democracy only works if we protect the 'marketplace of ideas.' This free exchange

9

facilitates an informed public opinion, which, when transmitted to lawmakers, helps produce laws that reflect the People's will." *B.L.*, 141 S.Ct. at 2046. "'We cannot lose sight of the fact that, in what otherwise might seem a trifling and annoying instance of individual distasteful abuse of a privilege, these fundamental societal values are truly implicated.'" *Id.* at 2048 (quoting *Cohen*, 403 U.S. at 25). "First Amendment protection against government regulation" "extend[s] to speech that is couched in vulgar and offensive terms." *Id.* at 2056 (Alito, J., concurring). "Prohibiting [a speaker] from coupling an expletive to his political speech is clearly unconstitutional." *Leonard v. Robinson*, 477 F.3d 347, 360 (6th Cir. 2007) (relying on *Cohen*).

**B.    T.C.A. § 55-8-187 Does Not Even Purport to Cover Mere Political Pejoratives**

Tennessee law *recognizes* these First Amendment principles, and—despite Defendants' claims—it does not purport to ban such political pejoratives. T.C.A. § 55-8-187 provides (emphasis added):

> To avoid distracting other drivers and thereby reduce the likelihood of accidents arising from lack of attention or concentration, the display of *obscene and patently offensive* movies, bumper stickers, window signs or other markings on or in a motor vehicle that are visible to other drivers is prohibited and display of such materials shall subject the owner of the vehicle on which they are displayed, upon conviction, to a fine of not less than two dollars or more than fifty dollars.

This forbids only the display of "obscene *and* patently offensive" material. T.C.A. § 55-8-187 adds that "'Obscene' or 'patently offensive' has the meaning specified in § 39-17-901," which in turn defines "obscene" and "patently offensive" as follows:

> (10) "Obscene" means:
>
>> (A) the average person applying contemporary community standard would find that the work, taken as a whole, *appeals to the prurient interest*;
>>
>> (B) the average person applying contemporary community standards would find that the work depicts or describes, in a *patently offensive* way, sexual conduct; *and*

(C) the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.

(11) "Patently offensive" means that which goes substantially beyond customary limits of candor in describing or representing such matters;

T.C.A. § 39-17-901(10) (italics added).

Thus, to be "obscene," *in addition to* lacking any "serious literary, artistic, political, or scientific value," the material must *both* "appeal to the prurient interest"—which means "a shameful or morbid interest in sex," *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)—*and* be "patently offensive." The statutory scheme makes quite plain that it is not enough for the material to be "patently offensive" *alone*, as Defendants claim. *United States v. Boucha*, 236 F.3d 768, 774 (6th Cir. 2001) (quoting *United States v. Choice*, 201 F.3d 837, 840 (6th Cir. 2000) ("when interpreting statutes, '[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear'").

The scheme also erases any conceivable doubt on this point by defining "patently offensive" not as a standalone term with its own independent meaning or effect but solely as *dependent* term that provides further explanation and context for determining whether the material is "obscene." That is, material is "patently offensive" when it "goes substantially beyond customary limits of candor in describing or representing *such* matters." T.C.A. § 39-17-901(11) (italics added). Both contextually and linguistically, "such" unquestionably refers back to the second element of the obscenity definition (i.e., "the average person applying contemporary community standards would find that the work depicts or describes, in a *patently offensive* way, sexual conduct"). That is the only way to make sense of the language. *See Ford Motor Co. v. United States*, 768 F.3d 580, 587 (6th Cir. 2014) (quoting *Menuskin v. Williams*, 145 F.3d 755, 768 (6th Cir. 1998)) ("We 'must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the

11

same statute inconsistent, meaningless or superfluous.'"); Oxford Lexico online dictionary, https://www.lexico.com/en/definition/such, last visited November 10, 2021 ("such" generally means "[o]f the type previously mentioned").

Even if one *could* read "patently offensive" as having some kind of meaning independent of the definition of "obscene"—which, again, would not be reasonable—the general prohibition only applies to "obscene *and* patently offensive" material. T.C.A. § 55-8-187. So, no matter what, it's not enough that the material "goes substantially beyond customary limits of candor in describing or representing such matters." It must meet *all* the required elements to be "*obscene*."

Defendants admit Ennis's window sticker "does not convey a message related to sexual conduct or a sexual interest," yet go on to argue that, "Tenn. Code Ann. § 55-8-187 prohibits not just bumper stickers that contain sexual content but also stickers which are 'patently offensive,'" and that, "Plaintiff's sticker was 'patently offensive' as defined by statute" because it "'goes substantially beyond customary limits of candor in describing or representing such matters,' Tenn. Code Ann. § 39-17-901(11)." SOMF ¶ 37. Sanford and Mahaney likewise asserted in discovery that they pulled over and cited Ennis because his window sticker was "patently offensive." SOMF ¶¶ 28, 29, 37. All Defendants, Sheriff Weatherford, and County Executive Holt thus argue in unison that T.C.A. § 55-8-187 creates a freestanding prohibition against "patently offensive" speech and that anything that *can be* "offensive" meets this supposed statutory test for suppression regardless of whether the message has anything to do with sexual conduct or sexual interests. SOMF ¶¶ 28, 36, 37 (numerous instances in the record where everyone makes such assertions).

But this is not a supportable interpretation of a statute that applies only to speech that is both "obscene and patently offensive." Again, on its face, T.C.A. § 55-8-187 has no application to sexually-neutral uses of the word "fuck," or similar "curse" words that merely "can be offensive,"

12

such as in messages like Ennis's message of "Fuck Gun Control"—just as *Cohen* made clear that the obscenity exception does not apply to "Fuck the Draft." *See supra*, Part A.

**C.      The Rights Defendants Violated Were Clearly Established**

The principles laid out above have been clearly established for 50 years. *Cohen* made that clear, and more recent cases from the Supreme Court, the Sixth Circuit, and Tennessee appellate courts, reinforce that. "The First Amendment offers sweeping protection that allows all manner of speech to enter the marketplace of ideas." *Bible Believers v. Wayne County, Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (en banc). "This protection applies to loathsome and unpopular speech with the same force as it does to speech that is celebrated and widely accepted." *Id.* "In fact, it is the minority view, including expressive behavior that is deemed distasteful and highly offensive to the vast majority of people, that most often needs protection under the First Amendment." *Id.* "Any other rule 'would effectively empower a majority to silence dissidents simply as a matter of personal predilections,' and the government might be inclined to 'regulate' offensive speech as 'a convenient guise for banning the expression of unpopular views.'" *Id.* (quoting *Cohen*, 403 U.S. at 21) (citations omitted).

Thus, being merely "offensive," or even "patently offensive," cannot justify suppression. "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). "'After all, much political and religious speech might be perceived as offensive to some.'" *Bible Believers*, 805 F.3d at 243 (quoting *Morse v. Frederick*, 551 U.S. 393, 409 (2007)). The Supreme Court has held that "Neo Nazis seeking to march with swastikas and to distribute racist and anti-Semitic propaganda in a predominantly Jewish community" were entitled to do so in the exercise of their First Amendment rights, even

13

though such speech was obviously extremely offensive to many in the community. *Id.* (citing *Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43-44 (1977)). Rather, "[w]e tolerate the speech with which we disagree. When confronted by offensive, thoughtless, or baseless speech that we believe to be untrue, the 'answer is [always] more speech.'" *Id.* (citation omitted). Surely that is equally true for criticism of gun control measures, even if some may view it as "offensive."

Likewise, the Tennessee Supreme Court has expressly held that "the elements of the *Miller* test are "the 'basic guidelines' for determining whether . . . material is obscene." *Davis-Kidd Booksellers, Inc. v. McWherter*, 866 S.W.2d 520, 524 (Tenn. 1993). The lower appellate courts have also long recognized that "offensive" speech can be suppressed only when it rises to the level of "fighting words" or "incitement." *State v. Creasy*, 885 S.W.2d 829, 831-32 (Tenn. Ct. App. 1994) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)) ("[t]hough the words to the officer were profane and insulting, the defendant contends, and we agree, that his words were not 'fighting words' because they neither inflicted injury nor tended to incite an immediate breach of the peace," under the Supreme Court precedents).

Even the state's own Attorney General has expressly opined that T.C.A. § 55-8-187 "will not reach bumper stickers that are in extremely poor taste but are not obscene" within the meaning of *Miller*. Tenn. Op. Atty. Gen. No. 04-086, 2004 WL 1178408, *2 (May 5, 2004). "[B]umper stickers such as 's..t happens', although unquestionably in poor taste, do not meet the constitutional or statutory standards for obscenity because they do not appeal to the purient [*sic*] interest." *Id.* Thus, based on law that has "long been understood and adopted by the State of Tennessee," "they cannot be banned as obscene." *Id.*

The "Fuck Gun Control" message simply does not fall within any of the limited categories of speech excluded from the free speech protections. The passive display of a political message

14

about gun control merely "offensive" to some comes nowhere near the realm of "fighting words" or "incitement" because it can in no way reasonably be construed as being '"directed to inciting or producing imminent lawless action"' *and* '"likely to incite or produce such action."' *Bible Believers*, 805 F.3d at 244 (quoting *Brandenburg*, 395 U.S. at 447); *see Cohen*, 403 U.S. at 20. Defendants do not attempt to claim this message constitutes such speech. They merely complain that "fuck" is a "curse word" that "can be offensive," based on their untenable reading of T.C.A. § 55-8-187. That's no better than claiming "an 'undifferentiated fear or apprehension of disturbance,'" which "is not enough to overcome the right to freedom of expression." *Id.* at 23.

## D.    Defendants' Law Enforcement Actions, Policies, Practices, and Customs Are Also Unconstitutionally Retaliatory

Defendants' targeting of Ennis also establishes an actionable claim of unlawful retaliation:

> A retaliation claim essentially entails three elements: (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Kennedy v. City of Villa Hills*, 635 F.3d 210, 217-18 (6th Cir. 2011). The plaintiffs "need not show they were actually deterred from exercising their right to free speech, but rather must show the actions were 'capable of deterring a person of ordinary firmness from exercising his or her right[s].'" *Center for Bio-Ethical Reform v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 397 (6th Cir. 1999)). The law of retaliation was clearly established long before the enforcement actions at issue, so Defendants had "fair and clear warning." *Kennedy*, 635 F.3d at 214. As the Sixth Circuit "stated unequivocally" back in 1999, "'Supreme Court decisions rendered long before the actions at issue in th[is] case recognize that government actions may not retaliate against an individual for the exercise of protected First Amendment freedoms.'" *Center for Bio-Ethical Reform*, 477 F.3d at 824 (quoting *Dietrich v.*

*Burrows*, 167 F.3d 1007, 1013 (6th Cir.1999)); *Kennedy*, 635 F.3d at 219 ("it is well-established that a public official's retaliation against an individual exercising his or her First Amendment rights is a violation of § 1983").

First, Ennis unquestionably engaged in protected conduct through the peaceable display of the political statement about gun control on his truck, for all the reasons stated above. Second, multiple adverse actions were taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct: he was (1) subjected to a traffic stop because of his speech; (2) detained while being accused of displaying unlawful speech; and (3) issued a formal citation for allegedly violating the state's "obscenity" law, which (4) Defendants then pressed forward for prosecution by doubling down on the accusation in the face of Ennis's repeated complaints about being illegally targeted.

Third, these adverse actions were "motivated *at least in part* by the plaintiff's protected conduct." *Kennedy*, 635 F.3d at 217-18 (italics added). The protected conduct was at the heart of all the adverse actions taken against Ennis. Defendants pursued these adverse actions against Ennis not only in direct contravention of the clearly established constitutional law but also in direct conflict with the state's own obscenity laws that do not even reach such speech. Doing so, particularly through the united front they have displayed in pressing the citation and claiming they have every right and intention of continuing to suppress all such speech, reveals a specific animus towards Ennis's protected speech.

All those involved have expressed a personal interest in suppressing Ennis's speech and the entire class of such speech, in standing behind their actions as valid, legal, and indeed righteous efforts to censor speech some may find "offensive." SOMF ¶¶ 28, 29, 36, 37. It is clear that

Defendants were motivated in their actions against Ennis at least "in part *because of* [his] constitutionally protected speech." *Center for Bio-Ethical Reform*, 477 F.3d at 823 (italics added).

**E.      Defendants' Law Enforcement Actions Violated the Fourth Amendment**

For the same reasons, Defendants' actions blatantly violated the Fourth Amendment. "The law is settled that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Brendlin v. California*, 551 U.S. 249, 255 (2007) (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity" under clearly established law. *United States v. Lyons*, 687 F.3d 754, 762-63 (6th Cir. 2012). Even for "reasonable suspicion," "the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an 'inchoate and unparticularized suspicion or 'hunch' of criminal activity." *Id.* at 123-24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). The officer must "possess[] a particularized and objective basis for suspecting the particular person of criminal activity based on specific and articulable facts." *Lyons*, 687 F.3d at 763. This is an objective standard based on "an examination of all facts and circumstances within an officer's knowledge" at the time of the seizure. *Leonard*, 477 F.3d at 354.

Viewed objectively in light of the clearly established law, it was unreasonable to believe any reasonable suspicion or probable cause existed based on Ennis's "Fuck Gun Control" message so as to permit a traffic stop, a detention to investigate the supposed commission of a crime in displaying this "offensive" speech, a criminal citation for allegedly violating the law, or the pressing forward of this citation into a prosecution. First, as discussed above, the law that Defendants invoked as the basis for these actions, T.C.A. § § 55-8-187, on its face does not reach such speech. Second, when the speech is protected by "First Amendment freedoms, clearly

17

established for a generation," *Leonard*, 477 F.3d at 356, which is certainly the case here, that protection necessarily "preclude[s] a finding of probable cause" for engaging in such speech. *Id.* at 351, 359-60 (holding that an arrest for "uttering 'God damn' while addressing a township board," violated the Fourth Amendment, and relying on *Cohen*, *id.* at 359-60).

Consequently, the record readily refutes Defendants' conclusory claim (with no argument or authorities) that they are "entitled to the defense of qualified immunity." Ans. ¶ 6, p. 16. "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action … assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *accord Cochran v. Gilliam*, 656 F.3d 300, 306 (6th Cir. 2011). "[T]he proper question is whether the facts demonstrate that a hypothetical reasonable officer would have known that his actions, under the circumstances, were objectively unreasonable." *Spainhoward v. White County, Tennessee*, 421 F.Supp.3d 524, 541 (M.D. Tenn. 2019) (citing *Lyons v. City of Xenia*, 417 F.3d 565, 576 (6th Cir. 2005)). "'The key inquiry is whether a defendant claiming qualified immunity "was on notice that his alleged actions were unconstitutional."'" *Coley v. Lucas County, Ohio*, 799 F.3d 530, 540 (6th Cir. 2015) (quoting *United Pet Supply, Inc. v. City of Chattanooga*, 768 F.3d 464, 485 (6th Cir. 2014)). Again, the law was crystal clear here, and the failure to abide by it was entirely unreasonable from an objective perspective, so there can be no protection under any theory of "qualified immunity."

## E. Plaintiffs Are Entitled to the Requested Relief as Essential to Remedy the Constitutional Harms Defendants Have Inflicted and Intend to Continue Inflicting

Defendants clearly intend to continue unconstitutionally targeting all speech of this type, and anything else they consider to be "patently offensive," based on their unreasonable and untenable interpretation of T.C.A. § § 55-8-187 as empowering them to suppress any speech

18

displayed motor vehicles involving "curse" words that "can be offensive" to some people. Again, Defendants insist "they had probable cause to pull Plaintiff over and issue the citation, as Plaintiff's window sticker was 'patently offensive' as defined by the above statutes." SOMF ¶ 18, 28, 29, 37.

Sanford, Mahaney, Downs, Edison, Weatherford, and Holt all expressly declare *as a general matter* that "if a bumper sticker is 'patently offensive,'" by which they mean it merely *could* offend some people, "then the law will be enforced." SOMF ¶ 29. They further declare in unison that "their policies and procedures are appropriate." *Id.* And their existing Policy and Procedure Manual further confirms that Defendants and the SCSO will pursue in earnest these enforcement actions against protected speech because the SCSO's general policy in the enforcement of traffic-related laws is to employ enforcement mechanisms in the issuance of traffic citations that are "continuous and consistent" and have the effect of ensuring the accused "will not commit the violations again." *Id.*

Thus, the requested declaratory and injunctive relief, which would hold these policies, practices, and customs to be in violation of the First, Fourth, and Fourteenth Amendments to the United States Constitution as well as the counterpart provisions of the Tennessee Constitution, and which would bar Defendants from continuing to enforce the same, is necessary. Absent such relief, this protected speech—entitled to "special protection" as "occupy[ing] the highest rung of the hierarchy of First Amendment values" in the "marketplace of ideas," *B.L.*, 141 S.Ct. at 2055—will remain subject to illegal suppression.

## F.     All Plaintiffs Have the Standing Necessary to Pursue These Claims

All Plaintiffs have standing to bring these claims and seek this relief. Defendants admit such jurisdiction is proper over Ennis's claims. SOMF ¶ 41. They also admit that venue is proper in this district. SOMF ¶ 42. They only challenge jurisdiction and venue as to the claims of Plaintiffs

19

brought in a representative capacity for similarly situated individuals and those of Plaintiffs FPC and FPF brought in a representative capacity for the organizations' similarly situated members.

"Even where an organizational plaintiff lacks standing to sue in its own right, it may sue on behalf of its members if 'its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Online Merchants Guild v. Cameron*, 995 F.3d 540, 549 (6th Cir. 2021) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)).[3]

Plaintiffs FPC and FPF are non-profit, public interest organizations whose core purposes involve advancing and defending the individual constitutional liberties of their members, including their Tennessee members like Ennis, who seek to peaceably exercise their rights to speak—especially concerning restrictions on their Second Amendment rights—without being subjected to unconstitutional suppression, retaliation, search, or seizure in violation of the First and Fourth Amendments. SOMF ¶ 38. Thus, the rights of their members at stake here are "germane" to the organizations' purposes. *Daunt v. Benson*, 956 F.3d 396, 418 (6th Cir. 2020).

Ennis is a member of FPC and FPF. SOMF ¶ 39. His individual standing alone is sufficient for Plaintiffs FPC and FPF to bring these claims on behalf of all their similarly situated members. "[A]n organization can achieve representational standing if 'its members, *or any one of them*, are

---

[3]     In the Complaint, Plaintiffs FPC and FPF alleged these claims on behalf of both their members and themselves, based on the organizations' expenditure of resources in investigating and defending against the impact of the challenged actions, policies, customs, and practices. Compl. ¶ 8. That is sufficient to establish their own standing. *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 576 (6th Cir. 2013) ("The Supreme Court and this Circuit have found that a drain on an organization's resources ... constitutes a concrete and demonstrable injury for standing purposes."). However, Plaintiffs FPC and FPF are relinquishing the claims on behalf of themselves and only pursuing the claims on behalf of their members.

suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.'" *Ball by Burba v. Kasich*, 244 F.Supp.3d 662, 682 (S.D. Ohio 2017) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)) (italics added); *People's Rights Organization, Inc. v. City of Columbus*, 152 F.3d 522, 528-531 (6th Cir. 1998) (the standing of two individual plaintiff-members was sufficient for the organizational plaintiff to pursue a firearms regulation challenge behalf of all "similarly situated members"); *Memphis A. Philip Randolph Institute v. Hargett*, 2 F.4th 548, 555 (6th Cir. 2021) (the standing of one member was sufficient for Tennessee NAACP to achieve associational standing).

Further, no members of FPC or FPF need participate in the action besides Ennis because the primary relief that Plaintiffs seek is declaratory and injunctive relief in nature.[4] *See Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) ("The individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members."); *accord Barry v. Lyons*, 834 F.3d 706, 716 (6th Cir. 2016); *Ball by Burba*, 244 F.Supp.3d at 683. Thus, Plaintiffs do indeed have standing to bring these claims on behalf all members of FPC and FPF who are similarly situated to Ennis.

---

[4]     The Complaint alleged that Ennis has suffered stress and anxiety attendant to being detained in a traffic stop, accused of a crime, issued a formal citation for violating state law, and subjected to the prosecutorial powers of the government that flowed from the Defendants' issuance and pressing of the citation at issue. Compl. ¶ 43. However, Plaintiffs are not pursuing any monetary damages on account of such stress and anxiety. Instead, they are seeking only declaratory and injunctive relief, with any monetary damages limited to nominal damages as "a symbolic remedy for past wrongs," *Miller v. City of Cincinnati*, 622 F.3d 524, 533 (6th Cir. 2010). *See Coleman v. General Motors Acceptance Corp.*, 220 F.R.D. 64, 82-83 (the true character of the case was declaratory and injunctive in nature because the plaintiffs sought only nominal damages while focusing on declaratory and injunctive relief). The only other monetary relief Plaintiffs seek is the recovery of reasonable attorney fees, costs, and expenses that a prevailing party is entitled to recover under 42 U.S.C. § 1988.

## Conclusion

For all these reasons, summary judgment on these claims should be granted based on the undisputed and undisputable facts in the record: "[t]he court *shall* grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this case, "there is no need for trial because the dispute is 'so one-sided that one party must prevail as a matter of law.'" *K.V.G. Properties, Inc. v. Westfield Insurance Company*, 900 F.3d 818, 822 (6th Cir. 2018) (quoting *Maben v. Thelen*, 887 F.3d 252, 263 (6th Cir. 2018)). "[T]here are no genuine issues of material fact and reasonable minds can come to but one conclusion," *Leach v. Walls*, 993 F.Supp. 1103, 1107 (N.D. Ohio 1997)—that Defendants have violated and will continue to blatantly violate the fundamental constitutional rights at stake, unless and until Plaintiffs obtain the requested declaratory and injunctive relief against them.

Dated this 15th day of November 2021

Respectfully Submitted,

*/s/ Raymond M. DiGuiseppe*
Raymond M. DiGuiseppe
The DiGuiseppe Law Firm, P.C.
4320 Southport-Supply Road, Suite 300
Southport, NC 28461
Tel.: 910-713-8804
Email: law.rmd@gmail.com
*Admitted Pro Hac Vice*

*/s/ Lloyd R. Tatum*
Lloyd R. Tatum
BPR # 011326
Tatum & Tatum
Tatum Building
124 E. Main Street
P.O. Box 293
Henderson, TN 38340
Tel.: 731-989-3493
Email: Lloydtatum1@yahoo.com
*Local Co-Counsel*

*/s/ Michael P. Sousa*
Michael P. Sousa
Law Offices of Michael P. Sousa, APC
3232 Governor Dr., Suite A
San Diego, CA 92122
Tel.: 858-453-6122

*/s/ Eugene Volokh*
Eugene Volokh
385 Charles E. Young Dr. E.
Los Angeles, CA 90095
Tel.: 310-206-3926
Email: volokh@law.ucla.edu

## CERTIFICATE OF SERVICE

Plaintiffs certify that on the 15th day of November, 2021, a copy of the foregoing was filed electronically. Notice of this filing will be sent through the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.[5]

---

[5] Counsel for Defendants Sumner County, Kyle Mahaney, Justin Downs, and Carl Edison have just withdrawn from their representation of Defendant Sanford, effective November 15, 2021. Defendant Sanford has yet to designate other counsel or declare an intention to proceed *pro se*.

23